WOOD, P. J.—This
is an action to enjoin the defendant from engaging in activities which allegedly constitute the practice of public accountancy. Defendant appeals from the preliminary injunction entered therein. Appellant contends that its activities do not constitute the practice of public accountancy, and that the preliminary injunction is too broad in scope.
Section 5060 (now § 5050) of the Business and Professions Code provides that no person shall engage in the practice of public accountancy unless he is the holder of a permit issued by the State Board of Accountancy.
Section 5117 of that code provides, in part, that whenever in the judgment of the board any person has engaged in any acts or practices which constitute an offense under the provisions of the licensing act, the board may make an application to the appropriate court for an order enjoining such acts or practices, and upon a showing that such person has engaged in such acts or practices, an injunction shall be granted.
The complaint alleges, in substance, that a permit to practice accountancy in California has never been issued to defendant ; since December 20, 1957 (when defendant corporation was formed), defendant has engaged in certain activities (specified in the complaint) which constitute the practice of public accountancy. The prayer of the complaint is that a preliminary injunction, and a permanent injunction, be issued enjoining defendant from engaging in such activities, and from practicing public accountancy in California.
An order was issued requiring defendant to show cause why a preliminary injunction should not be issued.
Defendant, in its answer to the complaint, admits that a permit to practice accountancy has never been issued to it; admits, in general effect, that it has engaged in the activities alleged in the complaint; and denies that such activities constitute the practice of public accountancy.
In support of the application for a preliminary injunction, plaintiff filed an affidavit of Mr. Burnell, and affidavits of 12 other persons.
Mr. Burnell stated in his affidavit, as follows: He is a special investigator for the board of accountancy. On December 4, 1958, he called at the office of defendant in Los Angeles and talked with Mr. Buttenberg and Mr. Greenberg. He (Burnell) stated that the purpose of his visit was to ascertain the operational procedure of defendant, and to determine whether *153 defendant was engaged in the practice of public accountancy. Mr. Greenberg stated that “they” were financial consultants for small business firms, that from information gathered by their field representatives, and from information supplied by the clients and the clients’ accountants, a business and financial report was prepared which was distributed to a list of accredited lending institutions, that defendant did not lend money, but, through a list of accredited lending agencies, it could find money needed by businessmen. Mr. Rye, who was defendant’s public relations officer and administrator, described the activities and services performed by defendant. Those activities and services, as described by him, were as follows: Defendant sent a printed-form letter to potential borrowers of money. (A copy of that letter is attached to the affidavit and marked Exhibit B.) A card, on which a reply could be made, was enclosed with the letter. In the event the future client returned the card, stating thereon that he was interested in defendants’ services, a field representative of defendant would call on the prospective client and attempt to obtain his signature on a form entitled, “Financial Service Agreement.” (A copy of that agreement is attached to the affidavit and marked Exhibit A.) The fee for defendant’s services was based on the amount of money which the client proposed to borrow. (A copy of the fee schedule is attached to the affidavit and marked Exhibit E.) In the event the prospective client signed the service agreement, defendant’s field representative then filled out, from information furnished by the client, a form entitled, “Preliminary Data Report,” and a form entitled, “Financial Data.” (Copies of those forms are attached to the affidavit and marked Exhibits F and G.) The function of the field representative was to get the- fee in advance, get the client’s name on the contract, and prepare the preliminary data report and the financial data sheet. After the field representative submitted the fee and said documents to defendant’s main office, defendant forwarded to the client, for completion and return to defendant, a form entitled, “Personal History Report.” (A copy of that form is attached to the affidavit and marked Exhibit H.) Defendant also forwarded cards to the client, which cards were to be signed by the client as authority for his accountant, his bank, and two of his “suppliers,” to release to defendant information regarding the client. If the client had copies of his financial statements *154 of recent dates, and he had financial statements for the two previous years, the field representative would take the statements and submit them with the preliminary data report. Normally, the client’s accountant was provided with blank profit and loss statements and balance sheet forms which he was asked to fill out and forward to defendant. (Copies of those forms are attached to the affidavit and marked Exhibits J and K.) The information stated in the preliminary data report was presented in a condensed form to lenders on a form which was entitled, “Financial Service Bulletin.” From the preliminary data report, the personal history report, the credit references, and the financial statement supplied by client’s accountant, if the client had an accountant, the defendant prepared a working proof form of the business and financial reports. (A copy of that form is attached to the affidavit and marked Exhibit L.) That form was sent to the client for his correction and approval. After the client returned this form to defendant, a final form was prepared (printed) for distribution to defendant’s accredited lenders. (A copy of that form is attached to the affidavit and marked Exhibit M.) Additional copies of the final report were sent to the client with the suggestion that he might want to use them for credit purposes. If a lender who received the business and financial report was interested, he would send a card to defendant indicating such interest. Then defendant would send a letter to the lender stating the information which defendant had regarding the client. Such information included photostatic copies of preliminary data report, balance sheet, profit and loss statement, personal history report, credit information, etc.
A further description of the exhibits referred to in Mr. Burnell’s affidavit is given in the following eight paragraphs.
The printed form letter sent by defendant to potential borrowers (Exhibit B) states at the beginning thereof, “Can your business use additional cash to : Increase your inventories. . . . Invest in other sound business activities.” The letter also states: “Money is available to firms on a Business Loan basis. If your company can use long-term financing from $5,000 to $500,000, not readily available through your local bank, we may be able to help you. Lenders Service Corporation will discuss your Business Loan requirements, and advise you as to the possibility of securing additional funds for your business.”
*155 The Financial Service Agreement (Exhibit A) provides, in part, as follows :
“Applicant agrees to:
“Provide LSC’s [defendant’s] authorized representative all necessary information to assist in preparation of ‘Applicant’s Preliminary Data Report.’
“Provide financial statements on standard LSC forms.
“Provide personal history on standard LSC forms.
“Provide promptly such additional information or references as may be requested by LSC and/or lending companies.
“Pay to LSC the sum of $-
as follows: _”
That agreement also provides, in part, as follows :
“Lenders Service Corporation agrees to:
“Analyze and evaluate Applicant’s Preliminary Data Report as compiled and submitted by authorized representative for consideration by LSC.
“Advise client of acceptance of agreement and, if accepted, furnish standard LSC forms to applicant to provide data requested by LSC.
“Analyze applicant’s Preliminary Data Report for compilation into a condensed description of applicant’s financial requirements, (Financial Requirements Bulletin), to be distributed to various lending agencies.
“Analyze all data obtained for compilation into a ‘Business and Financial Report’ based upon detailed information provided by applicant.
“Analyze applicant’s requirements for submission of Business and Financial Report to selected lending agencies and/or individual lenders as classified by LSC.
“Advise applicant of pertinent developments and make such recommendations as are in keeping with customary financial consulting standards and practices.
“LSC agrees to perform its financial consulting services for Applicant with the understanding that such services do not include negotiation of loans or other capital grants to Applicant. Applicant hereby authorizes LSC to act on its (his) behalf, to send financial data and other information furnished by Applicant to lenders and lending institutions, and authorizes LSC to confirm such data, within the discretion of LSC, by direct correspondence with Applicant’s credit and bank references, accountant, and/or by other means.”
*156 The fee schedule (Exhibit E) states that defendant’s fee is $150 when the amount desired is less than $7,500; $300 when the amount is less than $15,000; $450 when less than $30,000; $750 when less than $75,000; $1,200 when less than $150,000; and $1,950 when less than $500,000.
The Preliminary Data Report (Exhibit F) includes blank spaces in which defendant’s field representative is to fill in such information as type of organization; purpose for which money is needed; amount of money needed, and for what period of time; how loan will be protected; whether financial statements are available; whether there is a credit rating on the business; names of accountant, banks and principal suppliers; what products are sold, and to whom.
The Financial Data form (Exhibit G) includes blank spaces in which defendant’s field representative is to fill in such information as gross receipts; gross profits; net profits; assets; liabilities; monthly rent; terms of lease; suggested source of funds; law suits; judgments; representative’s opinion with reference to helping client in qualifying for loans. The form also includes the following:
“I certify that all statements and assertions herein are true and accurate to the best of my knowledge and that no attempt has been made to exaggerate or conceal information.
Lenders Service Corporation
Representative ’ ’
The Personal History Report (Exhibit H) includes blank spaces in which the client is to fill in such information as date and place of birth; business and employment report; personal assets and liabilities; matrimonial status; health condition; education.
The final report form (Exhibit M) includes such information as the name and address of the client; whether ownership of business is individual, partnership or corporation; type of business; amount of loan requested; use to be made of loan; how loan is to be secured; statement of assets and liabilities; profit and loss statement; credit reports available; bank credit report; suppliers credit reports; method of operation; where business operates; personal history of applicant; opinion as to desirability of furnishing financial assistance to client.
Mr. Babcock, who owns a music store, stated in his affidavit in support of the preliminary injunction: In June, 1958, he replied to an advertisement, which he received from de *157 fendant. On July 10, Mr. Aaron, a representative of defendant, came to his store and said that defendant had been investigating Mr. Babcock for some time and had found that he would be eligible for a loan. Aaron and Babcock examined the financial statements of Babcock for 1956, 1957, and 1958. Aaron said that Babcock could qualify for a loan, that he would recommend that Babcock apply for a loan of $6,500, rather than a loan of $5,000, since it would not cost any more; the fee would be $150 for defendant’s services; that defendant did not personally lend money but that it had contacts; upon its recommendation the money was almost automatically forthcoming; it was necessary to pay the fee in advance to show good faith; in case the loan did not go through, Babcock would get his money back. The affidavit stated further that Aaron “filled out” a financial service contract. Babcock signed the contract and gave Aaron a check for $150. Aaron “filled out” a preliminary data report and a financial information sheet from information given by Babcock. At Aaron’s request, Babcock prepared a copy of Babcock’s current financial statement. About July 15, Babcock received a letter from defendant in which there were five envelopes. One envelope was for Babcock’s accountant, one for his bank, and two for his suppliers. In the fifth envelope, there was a “personal history form” which Babcock was to “fill out” and mail to defendant. In the four envelopes, first above mentioned, there were cards which Babcock was to sign in order to authorize his accountant, bank, and the suppliers to release to defendant information regarding Babcock’s credit. The accountant’s envelope also contained a blank profit and loss statement and a balance sheet which the accountant was to fill out and return to defendant. Babcock followed all the directions. A few days later he received a financial requirements bulletin from defendant which described his financial needs. A few days later he received a working proof copy (printed) of his financial statement, which he was asked to examine and, if there were no corrections, to approve and return it to defendant. He approved and returned the proof. About August 1, he received five copies of the printed financial statement and report which defendant had prepared. A copy of that report is attached to his affidavit. The net profit as shown on the 1958 financial statement was $2,118 for six months, whereas that amount was the profit for three months. He called Bye, in defend *158 ant’s office, and notified him of the discrepancy, and said that it would be useless to apply for a loan based on a net profit of that amount for six months. Mr. Rye replied that he didn’t think “that” would affect the application much, and he thought he could still get the loan. Subsequently Mr. Babcock received a report from defendant that his request for a loan had been sent to various lending institutions. He did not obtain a loan.
The copy of the report attached to Babcock’s affidavit is substantially the same, in form, as Exhibit M which is attached to Rumell’s affidavit.
Mr. Caruso, who owns a cutlery business, stated in his affidavit in support of the preliminary injunction: On June 13, 1958, Mr. Burrs, a representative of defendant, called on him and they had a conversation regarding the loan service. He signed a contract and gave Burrs a cheek for $300 to start the loan procedure. Burrs said that if “they” did not accept the loan, the $300 would be refunded, and it would take about three weeks to get the loan. Burrs filled out a preliminary data report and a financial data sheet from information given by Caruso. Burrs said that “we” could increase the figures, or balloon Caruso’s financial statement, to make the figures look better and make it easier to obtain a loan. A few days later, Caruso received from defendant a letter which contained (1) a copy of the financial service agreement, (2) cards which were to be sent to his accountant, bank, and suppliers, authorizing them to release information to defendant, (3) profit and loss statement and balance sheet forms which he was to send to his accountant for completion, and (4) a personal history form which he was to fill out and return to defendant. He did not fill in the forms or forward the other documents as requested by defendant. On July 3, he received another set of the forms from defendant. He did not complete or return the forms. A few days later he received a financial requirements bulletin which related facts regarding his loan. About July 24, he received a preliminary working proof of his business and financial report. He did not approve or return the proof. On September 3, he received six copies of a business and financial report which had been prepared by defendant. A copy of that report is attached to his affidavit. On September 22, he received a placement submission report which showed that his financial statement had been submitted to various lending institutions. He did not *159 receive an inquiry from any lending institution regarding a loan.
The copy of the report attached to Caruso’s affidavit is substantially the same, in form, as Exhibit M attached to Burnell's affidavit.
The ten other affidavits, in support of the preliminary injunction, contained statements that the affiants had signed defendant’s Financial Service Agreement. The statements in those affidavits regarding the activities of defendant, with respect to each of said affiants, "were in substance the same as the statements in the affidavits of Babcock and regarding the activities of defendant. Those affidavits included statements to the effect that each affiant had paid a fee, had received a financial report which had been prepared by defendant, and had not received a loan.
In opposition to the application for a preliminary injunction, defendant filed affidavits of Mr. Cova, Mr. Ruttenberg, and Mr. Whalen.
Mr. Cova stated in his affidavit, as follows: He is assistant secretary and treasurer of defendant. He obtained reports from the following named companies: Dun and Bradstreet, Inc.; National Credit Office, Inc.; Coldwell, Banker and Company; and F. Barton and Company. The reports were prepared, published, and presented by each of said companies as a part of its service. The reports are attached to his affidavit.
Mr. Ruttenberg stated in his affidavit, as follows: He is treasurer of defendant. The issuance of a preliminary injunction would work a substantial hardship upon defendant, its employees, and persons who have contracted for defendant’s services. Defendant employs more than 175 persons and pays monthly salaries and commissions aggregating more than $75,000. Defendant is servicing more than 2,500 contracts, and many of “these files” are at the point where a lending institution has expressed interest in lending funds to defendant’s clients. It would work substantial inequity to bring this activity to a halt on the tenuous legal basis asserted by plaintiff and upon the minimum showing in the affidavits filed by plaintiff. The Los Angeles office of defendant is defendant’s national headquarters and all contracts originating in offices in New York, Cleveland, Chicago, Dallas, Atlanta and Denver are processed in California. The issuance of a preliminary injunction in California would result in hardship to employees and clients outside of California. *160 Several companies purport to offer the same or similar services as defendant. None of these companies has been brought before this court. The issuance of a temporary injunction in all likelihood would result in defendant’s entire staff finding employment elsewhere, and the resumption of operations after defendant prevails would consume time and be expensive. Four sales representatives, who were referred to in the affidavits filed on behalf of plaintiff, are not now employed by defendant.
Mr. Whalen stated in his affidavit (in opposition to the application for a preliminary injunction) : He is a licensed certified public accountant; since 1942 he has been engaged in the practice of accountancy; from 1949 to 1957 he was secretary of the Board of Accountancy; he has been retained by defendant as a special consultant; he has examined the operations and activities of defendant, and he has reviewed the standard forms and documents used by defendant in its business; he has read the complaint and the affidavits filed in support of the application for a preliminary injunction; the information contained in the affidavit of Burnell, insofar as it relates to the procedure and the activities of defendant, is generally in accordance with his (Whalen’s) knowledge of such procedure and activities; Exhibits A through L, inclusive (attached to Burnell’s affidavit), are currently used by defendant; Exhibit M has not been used by defendant since January 1, 1959; the form now used by defendant is attached to his (Whalen’s) affidavit; his opinion is that defendant has not engaged, and does not engage, in the practice of accountancy as defined in the California Accountancy Act. His reasons for his opinion are stated at length in the affidavit.
The preliminary injunction enjoined defendant from doing acts, as follows: “1. Soliciting, accepting, entering into or enforcing in the State of California, contracts similar to Exhibit A, attached to the Complaint on file in this action. [Exhibit A is the same contract form as Exhibit M attached to Mr. Burnell’s affidavit.]
“2. Offering to prospective clients for compensation to perform in California professional services that involve the review and presentation of financial transactions and accounting records.
“3. Performing in California for compensation on behalf of clients professional services that involve review and presentation of financial transactions and accounting records.
*161 “4. Preparing in California for clients, reports on balance sheets, profit and loss statements, oral statements and reports, financial schedules and accounting schedules for submission to business and financial institutions for the purpose of obtaining credit.
“5. Practicing public accountancy within the State of California in any manner whatsoever. ’ ’
Appellant contends that its activities do not constitute the practice of public accountancy.
Section 5061 of the Business and Professions Code provides, in part: “Except as provided in Section 5062,[1] a person shall be deemed to be engaged in the practice of public accountancy within the meaning and intent of this chapter:
“ (a) Who holds himself or herself out to the public in any manner as one skilled in the knowledge, science and practice of accounting, and as qualified and ready to render professional service therein as a public accountant for compensation; or
“(b) Who maintains an office for the transaction of business as a public accountant; or
“(c) Who offers to prospective clients to perform for compensation, or who does perform on behalf of clients for compensation, professional services that involve or require an audit, examination, verification, investigation, certification, presentation, or review, of financial transactions and accounting records; or
“(d) Who prepares or certifies for clients reports on audits or examination of books or records of account, balance sheets, and other financial, accounting and related schedules, exhibits, statements, or reports which are to be used for publication or for the purpose of obtaining credit or for filing with a court of law or with any governmental agency, or for any other purpose; or
“(e) Who, in general or as an incident to such work, renders professional services to clients for compensation in any or all matters relating to accounting procedure and to the *162 recording, presentation, or certification of financial information or data.”
Appellant argues that its services are routine and clerical and involve the mere clerical filling of blank spaces in stereotyped forms.
As above shown, by the service agreement, the services which defendant offered to perform included services as follows: (1) Analyzing and evaluating applicant’s preliminary report as compiled by defendant’s representative. (2) Analysing that report “for compilation into a condensed description of applicant’s financial requirements” to be distributed to lending institutions. (3) Analyzing all data obtained for compilation into a “Business and Financial Report” to be sent to lending agencies. (4) Sending financial data and other information, furnished by applicant, to lenders.
As above shown, by affidavits filed on behalf of plaintiff, the defendant did perform the services which it offered to perform, and it performed those services and other services herein mentioned for compensation.
Also, as above shown by affidavits, the services which defendant performed involved services as follows: (1) An examination and review of the client’s financial statements. (2) Preparation of financial reports and profit and loss statements. (3) Certification and presentation of those reports and statements to lending institutions. (4) Preparation and presentation of personal history reports for the purpose of obtaining loans.
It thus .appears that the services which defendant offered to perform and did perform, under its service agreement, on behalf of its clients and for compensation, were services which involved an examination, review, and presentation of accounting records. Also, it appears that the services so performed by defendant included the preparation and certification, on behalf of clients, of reports on examinations of balance sheets and other financial statements and reports for the purpose of obtaining credit.
Said services come within the provisions of said section 5061 of the Business and Professions Code, above referred to, defining the practice of accountancy. That section provides: “ [A] person shall be deemed to be engaged in the practice of accountancy . . . (c) Who offers ... to perform ... or who does perform for compensation . . . services that involve . . . examination . . . presentation, or review ... of accounting *163 records; or (d) Who prepares or certifies . . . reports on . . . examinations of . . . balance sheets, and other financial . . . statements, or reports which are to be used .. . for the purpose of obtaining credit... or for any other purposes....”
It thus appears that such services which defendant offered to perform and did perform, under its service agreement, were more than routine and clerical services involving the mere filling of blank forms. Such services constituted the practice of public accountancy.
Appellant asserts that it is no more engaged in the practice of accountancy than Dun and Bradstreet, Inc., Cold-well, Banker and Company, and other financial institutions “which concern themselves with data presented by financial statements.” Of course, the question on appeal is whether defendant was practicing public accountancy, and the determination of that question does not depend upon the character of the business transacted by other companies. Even if such inquiry as to other companies were relevant, it cannot be determined from the record herein whether the businesses of the other companies are comparable to the business of defendant. The record does not show whether those companies have permits to practice accountancy, or whether the companies are compensated by the prospective borrowers of money or the prospective sellers of property, or in what manner they are compensated.
Appellant also contends, as above stated, that the injunction was too broad in scope. The argument on behalf of appellant with reference thereto is that the injunction treats the service contract as illegal per se without regard to the method by which it is performed or the place of its performance. As above shown, the trial court properly decided that provisions of the contract wherein defendant offered to perform such services constituted the practice of accountancy; and that the method by which defendant performed the services constituted the practice of accountancy. It is therefore apparent that the court did consider the method by which defendant performed its contract. With respect to the assertion that the trial court did not consider the place of performance of the contract, it is to be noted that the defendant was enjoined from offering to perform such services, for compensation, in California, and from performing such services, for compensation, in California. Said section 5061 of the Business and Professions Code makes no distinction *164 between offers in California to perforin such services in California and offers in California to perform such services outside California. It is apparent that the injunction was limited to acts within California, and that the court did consider the place of performance of the contract. Defendant’s assertion that the injunction is too broad and is vague and uncertain is not sustainable.
In view of the above conclusions, it is not necessary to discuss other questions on appeal.
The order granting the preliminary injunction is affirmed.
Fourt, J., and Lillie, J., concurred.
A petition for a rehearing was denied April 12, 1960, and appellant’s petition for a hearing by the Supreme Court was denied May 18, 1960. Dooling, J. pro tem.,* participated therein in place of Spence, J.

Section 5062 provides: “Nothing in this chapter shall apply to any person who as an employee, independent contractor, or otherwise, contracts with . . . persons, organizations, . . . for the purpose of keeping books, making trial balances ... all as a part of bookkeeping operations, provided that such trial balances ... or reports are not issued over the name of such person as having been prepared . . . by a . . . public accountant. ’ ’

Assigned by Chairman of Judicial Council.